# In the
# United States Court of Appeals
## for the Federal Circuit

WOLF CREEK RAILROAD LLC,

*Plaintiff-Appellant,*

v.

UNITED STATES,

*Defendant-Appellee.*

_____

Appeal from the United States Court of Federal Claims
No. 1:23-cv-01684-CNL.
The Honorable Carolyn M. Lerner, Judge Presiding.

## BRIEF OF PLAINTIFF-APPELLANT
## WOLF CREEK RAILROAD LLC

THOMAS K. DAVID
LEWIS P. RHODES
RESTON LAW GROUP LLP
2100 Reston Parkway
Suite 450
Reston, Virginia 20191
(703) 483-2810

*Attorneys for Plaintiff-Appellant*




FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2024-1873 |
| **Short Case Caption** | Wolf Creek Railroad v US |
| **Filing Party/Entity** | Wolf Creek Railroad |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/10/2024

Signature: *Lewis Rhodes*

Name: Lewis P. Rhodes

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Wolf Creek Railroad LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑      None/Not Applicable          ☐      Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)    ☑   No    ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑      None/Not Applicable          ☐      Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................................. i

TABLE OF AUTHORITIES ................................................................................. v

STATEMENT OF RELATED CASES ................................................................ vii

JURISDICTIONAL STATEMENT .......................................................................1

STATEMENT OF THE ISSUES ............................................................................1

STATEMENT OF THE CASE ................................................................................1

    Factual Background ..........................................................................................1

SUMMARY OF ARGUMENT .............................................................................9

ARGUMENT ......................................................................................................10

I.      Standard of Review...................................................................................10

        1.    The CFC Failed to Apply the Correct Legal Standard in Reviewing a Motion to Dismiss. ...........................................................11

        2.    The CFC Erred in Determining that the BOA and TUA Combined did not Give WCRR a Right to Seek a Direct Claim. .........................12

        3.    The Court Erred in Determining that AO was not Acting as the Army's Agent. ...................................................................................15

        4.    The Test in *Johnson Controls* Should be Expanded. ..........................18

        5.    The CFC Erred in determining that the Certified Claim Letter was not Submitted. ..................................................................................20

CONCLUSION ...................................................................................................23

# TABLE OF AUTHORITIES

*Appeals of - N. Wind Constr. Servs., LLC,*
  ASBCA No. 63641, 2024 WL 1700078 (Apr. 3, 2024) ......................................22

*Banks v. U.S.,*
  314 F.3d 1304 (Fed. Cir. 2003) ...........................................................................11

*Biltmore Forest Broadcasting FM, Inc. v. United States,*
  555 F.3d 1375 (Fed. Cir. 2009) ...........................................................................10

*Cary v. United States,*
  552 F.3d 1373 (Fed. Cir. 2009) ...........................................................................11

*Fed. Acquisition Servs. Team, LLC v. United States,*
  124 Fed. Cl. 690 (2016) .......................................................................................21

*First Annapolis Bancorp, Inc. v. United States,*
  644 F.3d 1367 (Fed. Cir. 2011) ...........................................................................11

*Fru-Con, Constr. Corp.,*
  ASBCA No. 53544, 02-1 BCA .............................................................................22

*Gould Inc. v. United States,*
  935 F.2d 1271 (Fed. Cir. 1991) .....................................................................11, 14

*Gonzalez v. Thaler,*
  565 U.S. 134 (2012) .............................................................................................22

*Insight Sys. Corp. v. United States,*
  110 Fed. Cl. 564 (2013) .......................................................................................21

*Kern-Limerick, Inc. v. Scurlock,*
  347 U.S. 110 (1954) .............................................................................................16

*Medlin Const. Grp., Ltd. v. Harvey,*
  449 F.3d 1195 (Fed. Cir. 2006) ...........................................................................13

*Ravi v. United States,*
  104 F.4th 1359 (Fed. Cir. 2024) ..........................................................................10

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998) ...............................................................................................22

*United States v. Johnson Controls*,
    713 F.2d 1541 (Fed. Cir. 1983) ........................................... 10, 15, 16, 18, 19, 20

*Zebel, LLC v. United States*,
    135 Fed. Cl. 47 (2017) ...............................................................13, 14

**Statutes and Rules**

10 U.S.C. §§ 7551-7555 .......................................................................1

10 U.S.C. § 7553(b)(6).......................................................................17

10 U.S.C. § 7554(b)(2)(B) ..................................................................17

28 U.S.C. § 1295(a)(3).........................................................................1

28 U.S.C. § 1491 ..................................................................................1

41 U.S.C. § 7101-7109 .........................................................................1

41 U.S.C. § 7103(a)(1)........................................................................20

41 U.S.C. § 7104..................................................................................23

42 U.S.C. § 11046................................................................................22, 23

Fed. R. Civ. P. 12(b)(6).......................................................................11

Fed. Cir. R. 35(a)(1)...........................................................................20

Restatement 3d of Agency, § 1.01 .......................................................18

**STATEMENT OF RELATED CASES**

Pursuant to Fed. Cir. R. 47.5, counsel for Appellant Wolf Creek Railroad LLC ("WCRR" or "Appellant") is not aware of any appeals from this civil action that have been made before this, or any other, appellate court.

## JURISDICTIONAL STATEMENT

This is an appeal from the final judgment of the United States Court of Federal Claims ("CFC") entered on March 26, 2024 granting a motion to dismiss on behalf of the United States (the "Government"). The CFC had jurisdiction over this case under the Tucker Act, 28 U.S.C. §1491 and under the Contract Disputes Act, 41 U.S.C. §7101-7109. WCRR filed a timely Notice of Appeal on May 22, 2024. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §1295(a)(3).

## STATEMENT OF THE ISSUES

1.     The CFC improperly granted the Government's Motion to Dismiss for lack of subject matter jurisdiction.

2.     The CFC's failure to apply the correct legal standard when evaluating Government Motion to Dismiss was reversible error.

3.     The CFC's finding that American Ordnance, LLC was not acting as the Government's purchasing agent was reversible error.

4.     The CFC's finding that WCRR Claim Letter was never submitted is erroneous.

## STATEMENT OF THE CASE

**Factual Background:**

This matter has its Genesis in the Armament Retooling and Manufacturing Support (ARMS) initiative (codified at 10 U.S.C. §§ 7551-7555) which established

a process for the Government, through the U.S. Army, to allow its facility managers, such as American Ordnance ("AO") to enter into contracts with third parties to use Government facilities.  This is exactly what happened in this case.

AO is the facilities manager for the Milan Army Ammunition Plant (MLAAP) in Milan, Tennessee. A position AO has held since entering into Contract No. W52P1J-09-E-0001 (the Facility Contract) with the U.S. Army Joint Munitions Command ("JMC" or "Army").  Joint Appendix ("Appx") 21, Appx40. Under the Facility Contract, AO had use of the government owned facilities to manufacture ammunition for the U.S. Government and other authorized parties. Appx49. In conjunction with the Facility Contract, JMC awarded Basic Ordering Agreement No. W52P1J-09-G-0001 (the BOA) to AO, establishing an instrument by which to acquire operation/maintenance services beyond the tasks required by the Facility Contract. Appx219.

In 2012, AO relocated all ammunition production to another facility, and MLAAP's production lines were shut down and transferred to inactive status. From 2012 until 2019, MLAAP's mission was to maintain capability to load, assemble, and pack medium-to-large caliber munitions and transfer the plant to a commercial distribution site. It was during this time that JMC instructed AO to find commercial tenants to make use of the facilities at MLAAP.

In 2017, AO, on behalf of JMC, sought a commercial tenant to utilize the railyard and railroad facilities (the "Facilities") on the Milan Army Ammunition Plant ("MLAAP"). At that time, AO was operating under its BOA with JMC. This BOA established MLAAP as a ***Government-Owned Contractor-Operated facility***. *See e.g.* Appx233.

WCRR submitted a proposal to lease the rail yard facilities on MLAAP. WCRR presented its proposal and use plan to a panel that included JMC personnel. In total spent nearly a year preparing and submitting a proposal and negotiating the TUA with AO and JMC. Appx382 at ¶¶ 13-16. This included multiple trips to MLAAP and presentations to both AO and JMC. Army personnel were present and deeply involved in every meeting and discussion with AO and WCRR about the proposed use of the MLAAP rail system.

The Army ultimately approved WCRR's proposal. On April 16, 2018, AO, pursuant to the requirements of the Facilities Contract, submitted its Request for Use of the Facilities ("RUF"). This request again states that AO is asking to use the "***Government-owned*** facilities at the MLAAP…" JMC approved the request for use of the facilities. In this approval, JMC stated that:

> Any subsequent contractual arrangement between AO and WCR shall be construed to be a TUA ***in accordance with the terms and conditions of the Armament Retooling and Manufacturing Support (ARMS) Statement of Work (SOW) as incorporated under Basic Ordering Agreement (BOA)*** Number W52P1J-09-G-0001; a copy of the TUA shall be provided to the Government upon finalization.

Appx306. This approval also further references MLAAP being a Government-Owned Contractor Operated facility. *Id.*

JMC's approval document has several clauses that JMC required to be included in the TUA. One of these clauses was that any cancellation of the TUA due to a transfer of MLAAP would not result in liability to the Government. Appx308 at ¶ 10. This language shows that the Army understood that without this clause in the TUA, the Army would be directly liable to AO for such a termination. However, as discussed in more detail below, the termination provision of the TUA, approved by JMC, unambiguously states that WCRR's remedies in the event of a termination for convenience by the Government lies directly against the Government rather than AO, pursuant to Part FAR 49 (Termination of Contracts) as it applies to fixed price contracts under FAR Subpart 49.2 -Additional Principles for Fixed-Price Contracts Terminated for Convenience. Appx323, TUA, Article 13 ("This Article 13 shall be administered according to FAR Part 49, as it applies to fixed priced contracts.")

AO and WCRR entered into the TUA on June 5, 2018.

Just over one year later, on August 20, 2019, the Army first notified AO and WCRR that JMC had decided to end the current mission needs at MLAAP. Appx424. In this correspondence, JMC told AO and WCRR, that they needed to cease marketing efforts and were not allowed to contract with any new tenants. *Id.*

This was why WCRR was unable to use all of the Facilities it was paying for from August 2019 until July 2022. Appx383 at ¶¶ 24-25.

WCRR remained in this state of limbo for twenty (20) months until April 26, 2021 when JMC first notified AO that the TUA needed to be terminated. Appx426 This notice set the termination date as December 31, 2021. This date was ultimately extended to July 2022. Appx383 at ¶ 26.

<u>Contract Termination Provisions</u>

There are three contracts applicable to this case: the Facilities Contract between JMC and AO, the BOA and the TUA. The latter two of these contracts are the most pertinent.

The BOA is the contract that authorized AO to enter into the TUA on behalf of JMC. Specifically, the BOA states:

2. Tenant Use Contact Length Authorization and Termination Under Facility Contracts:

2.1 Authorization

2.1.1 The ***Government may authorize the Contractor to use facilities in support of third party and/or tenant use agreements*** under this facility contract during the term hereof, for time periods not to exceed twenty-five (25) years, notwithstanding the fact that said time periods may exceed the term of this contract. Approval for such use shall not be construed as an extension of the facility contract. ***The approval for each use shall stand as separate agreements entered into under the authority of the facility contract,*** allowing use of those facilities specifically identified in the agreement for the specified period. ***Execution of each use and/or extension/option is dependent upon receipt of written authorization from the GOCO Contracting Officer***.

Appx233 (emphasis added). The BOA is clear that AO can only enter into a tenant use agreement upon the express approval of the Army. In other words, AO did not have complete authority over the use of the Facilities.

Additionally, the BOA expressly addresses a potential termination of a subcontract, including a TUA. Under the same section addressing TUA's, the BOA includes a section on potential termination, stating:

2.2    Termination:

***

2.2.3 In addition to the above, the GOCO Contracting Officer may issue the Facility Contractor (1) a one hundred eighty (180) day notice for termination of any contracts and/or tenant use agreements utilizing facilities required for ammunition mission purposes when the Program Executive Officer for Ammunition (PEO Ammo) determines it to be in the best interests of the Government, or (2) *a two year notice upon Army Acquisition Executive approval for reclamation of facilities or segments thereof* which are not immediately required for ammunition mission purposes. When either of these situations occurs, a timetable will be negotiated with the Facility Contractor (representing its own and any subcontractor interests) for the cessation of commercial production/operations and the return of the facilities to the Army.

2.2.4 *The FAR Part 30, 31, and 49, as well as FAR Appendix B, sets forth the terms for establishing appropriate termination settlement costs associated with any contracts, subcontracts, third party, or tenant use agreements being performed within the affected areas.* Settlement consideration costs must be found allowable, allocable, and reasonable in accordance with the FAR requirements. *Settlement consideration will include the contractors/subcontractors/tenant use contractor's financial investment and contractual commitment for each individual contract, subcontract, third party, and/or tenant use agreement impacted*. Tenant use contractors will negotiate all settlement agreements with the Facility Contractor.

Appx233 (emphasis added). There is no dispute that JMC directed the termination of the TUA based on a reclamation of the facilities. A reclamation that was under consideration even before WCRR signed the TUA. Therefore, under the plain language of the BOA, FAR Part 49 applies and WCRR is entitled to settlement consideration for its "financial investment."

While the BOA is clear that AO was supposed to negotiate this termination settlement with WCRR, both JMC and AO ignored this requirement in finalizing the TUA. First, as discussed above, JMC originally directed AO to include language in the TUA forcing WCRR to waive any potential termination costs for certain changes in the status of the MLAPP as a Government-owned contractor-operated (GoCo) facility. Appx308. However, AO did not stipulate that the Government would not be liable if WCRR was forced to cease operations and vacate the facilities as a result of a change in the status of the MLAPP. Instead, Article 13 of the TUA, which was approved by JMC, separately addresses the liability of AO and the Government in the event of a termination. Appx308. Specifically, Article 13 states that if there is a termination for convenience, "the termination will be at **no cost to the Owner's representative and the Owner's representative shall be held harmless** for any damages as a result of the termination." Appx323. However, this section also states that any termination of the TUA "shall be administered according to FAR Part 49, as it relates to fixed price contracts." *Id.*

WCRR reasonably interpreted these provisions of the TUA when read together as unambiguously stating that after a termination for convenience, WCRR can pursue a termination for convenience claim directly against the Army in accordance with the applicable provisions of FAR Part 49.

Claim Letter Submission

WCRR first submitted its Certified Claim Letter on May 30, 2023. The letter was submitted via email to Mr. Partick Lootens, the JMC Contracting Officer noted on various letters and documents. This email was successfully delivered to the JMC's server as there was no notice of failed delivery or any other response. Appx373. Prior to commencing a Claim litigation, WCRR submitted the Claim letter on September 5, 2023. *Id.* This email included a delivery and a read receipt. The Army email server sent a delivery receipt on September 5, 2023 stating that the email message "was successfully delivered." This return receipt also states that if the message is delivered to the mailbox, "you will receive no further notifications." Appx374, Appx376.

During the pendency of this matter at the CFC, the Claim Letter was submitted a third time. After the Government raised the issue of a lack of a certification of the Claim Letter – 100 days after the service of the Complaint – WCRR sent the Certified Claim Letter to the Army Contracting Command via Federal Express.

Federal Express confirmed that that Claim Letter was received by the Army on February 20, 2024.[1]  Appx374, Appx377.

**Procedural Posture:**

WCRR filed its Complaint in the CFC on September 29, 2023. The Complaint brought claims both for the breach of the implied duty of good faith and fair dealing and for breach of contract damages under the Contract Disputes Act ("CDA"), 41 U.S.C. §7101, *et. seq.* The breach of good faith and fair dealing claim is based on the fact that JMC knew it was considering divesting MLAAP long before authorizing the TUA. JMC personnel met with WCRR multiple times during the proposal process, but they never mentioned the planned divesture of MLAAP. WCRR's CDA claim was based on the Army's failure to respond to the Certified Claim.

On January 8, 2024, the Government filed a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and (b)(6). After a full round of briefing, the CFC granted the motion to dismiss on March 26, 2024. This appeal followed.

## SUMMARY OF ARGUMENT

This is a clear case of the Army wanting it both ways.  It wants the ability to terminate the TUA for its convenience, but it wants to hide behind its facilities

---

[1] The Army has never responded to this Certified Claim Letter to even acknowledge it or to reject it based on the CFC's opinion in this litigation.

operator to be shielded from liability. The BOA is clear that TUA holders can seek a termination claim, a fact ignored by the Army throughout this process. The CFC erred in its interpretation of the relevant contracts. There is only one possible interpretation of the TUA – that WCRR can seek termination settlement costs under FAR Part 49 directly from the Government.

The CFC erred in granting the Government's Motion to Dismiss for lack of subject matter jurisdiction. As an initial matter, the CFC failed to provide the appropriate standard of review for a motion to dismiss in failing to accept all allegations in the Complaint as true. The Complaint avers in several places how the AO was acting at and under the direction of the Army, none of which were considered by the CFC. The facts as pled, as well as the direction in the documents, shows that AO was at all times serving as an agent for JMC. As such the CFC should have determined that WCRR could pursue its Claim directly against the Government under the test articulated in *United States v. Johnson Controls*, 713 F.2d 1541, 1551 (Fed. Cir. 1983).

## ARGUMENT

## I.    Standard Of Review

This Court reviews a CFC's "dismissal for lack of subject-matter jurisdiction in this case de novo." *Ravi v. United States*, 104 F.4th 1359, 1363 (Fed. Cir. 2024) (citing *Biltmore Forest Broadcasting FM, Inc. v. United States*, 555 F.3d 1375, 1380

(Fed. Cir. 2009). *See also First Annapolis Bancorp, Inc. v. United States*, 644 F.3d 1367, 1373 (Fed. Cir. 2011) ("standing to bring suit is also a question of law, reviewed without deference").

This Court has summarized the standard for reviewing a motion to dismiss under FRCP 12(b)(6) as:

> We must presume that the facts are as alleged in the complaint, and make all reasonable inferences in favor of the plaintiff. *Gould Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991). To state a claim, the complaint must allege facts "plausibly suggesting (not merely consistent with)" a showing of entitlement to relief. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1966, 167 L.Ed.2d 929 (2007). The factual allegations must be enough to raise a right to relief above the speculative level. *Id*. at 1965. This does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face.

*Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009).

Generally, the standard of review on cases from the CFC is *de novo* review on matters of law and clear error on findings of fact. *Banks v. U.S.*, 314 F.3d 1304 (Fed Cir. 2003).

1.  The CFC Failed to Apply the Correct Legal Standard in Reviewing a Motion to Dismiss.

The CFC failed to follow the guidance that in reviewing a motion to dismiss that all facts are as alleged in the complaint and make all reasonable inferences in favor of the plaintiff. *Gould Inc.,* 935 F.2d at 1274.

There are several allegations in the Complaint describing the agency relationship between the Army and AO:

¶ 11 It was during this time that ***JMC instructed AO*** to find commercial tenants to make use of the facilities at MLAAP.

¶ 12At all relevant times, ***AO was operating as the Army's agent*** and at the Army's instructions under the Operations & Maintenance Contract #W52P1J-09-E-0001.

¶ 13 In 2017, ***AO, at the direction of the Army***, began soliciting commercial companies to utilize the MLAAP facilities.

¶ 15 The **Army approved WCRR's proposal and instructed** AO to enter into a lease with WCRR.

¶ 27 As a result of the **Army's direct instruction to AO, AO, acting as the Army's agent** and representative, terminated the TUA.

Appx382, Appx383 (emphasis added).

At no point during its analysis as to whether or not AO was acting as the Army's agent did the CFC cite to and accept these facts as required when ruling on a motion to dismiss.

2.      The CFC Erred in Determining that the BOA and TUA Combined did not Give WCRR a Right to Seek a Direct Claim.

The CFC's determination that the BOA and TUA did not give the WCRR the right to submit a claim directly to the Government is flawed. As stated above, both

the BOA and the TUA incorporate FAR Part 49, which is the FAR section governing a termination by the Government. This part of the FAR provides the basis for a contractor's claim for a termination payment – such as the Claim advanced by WCRR. The incorporation of FAR Part 49 into these contracts can only be interpreted as having these termination provisions apply to the TUA.

This Court has stated that the "general rules of contract interpretation apply to contracts to which the government is a party. A reasonable interpretation must assure that no contract provision is made inconsistent, superfluous, or redundant." *Medlin Const. Grp., Ltd. v. Harvey*, 449 F.3d 1195, 1200 (Fed. Cir. 2006) (internal citations omitted).

In *Zebel, LLC v. United States*, the Court of Federal Claims succinctly described this Court's guidance for Contract interpretation:

> The court applies "three primary rules of contract interpretation." *Enron Fed. Sols., Inc. v. United States*, 80 Fed. Cl. 382, 393 (2008). First, contract interpretation "begins with the language of the written agreement." *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004); *see also Enron Fed. Sols.*, 80 Fed. Cl. at 393 (stating that contract interpretation "start[s] with the plain meaning of the Contract's text"). A contract "is read in accordance with its express terms and the plain meaning thereof." *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1543 (Fed. Cir. 1993); *accord U.S. Sur. Co. v. United States*, 83 Fed. Cl. 306, 311 (2008). These terms are given "their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." *Harris v. Dep't of Veterans Affairs*, 142 F.3d 1463, 1467 (Fed. Cir. 1998). The contract language "must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous

circumstances." *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 752 (Fed. Cir. 1999) (internal quotation marks omitted). Thus, "any subjective, unexpressed intent of one of the parties is ineffective." *Sterling, Winchester & Long, L.L.C. v. United States*, 83 Fed. Cl. 179, 183 (2008).

Second, the court applies the "settled principle[] of contract interpretation," *Dalton v. Cessna Aircraft Co*., 98 F.3d 1298, 1305 (Fed. Cir. 1996), that a contract "must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts," *NVT Techs*., 370 F.3d at 1159. Such an interpretation "is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous." *Id*. (citing *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991)); *see also United Int'l Investigative Servs. v. United States*, 109 F.3d 734, 737 (Fed. Cir. 1997) (stating that the interpretation of a contract must "avoid[] conflict or surplusage of its provisions").

Third, "[t]he mere fact that the parties disagree with regard to the interpretation of a specific provision, does not, standing alone, render that provision ambiguous." *Enron Fed. Sols*., 80 Fed. Cl. at 393; *accord Metric Constructors*, 169 F.3d at 751 ("To show an ambiguity[,] it is not enough that the parties differ in their respective interpretations of a contract term."). "Whether a contract provision is ambiguous is . . . a question of law." *NVT Techs,* 370 F.3d at 1159

*Zebel, LLC v. United States*, 135 Fed. Cl. 47, 59-60 (2017).

Applying these rules of contract interpretation to the BOA and the TUA shows that the FAR's termination provisions apply to WCRR's contract. *First*, the language in the BOA is clear and direct. Paragraph 2.2.4 of the BOA states that if JMC directs the termination of a TUA, then FAR Part 49 applies to the termination settlement costs which include a "… ***tenant use contractor's financial investment and***

*contractual commitment for each individual contract, subcontract, third party, and/or tenant use agreement impacted*." Appx234. WCRR's Claim seeks these exact costs.

*Second,* the TUA also contains clear language and must be read as a whole. Article 13 of the TUA addresses a potential termination. While Paragraph 13(a) says that AO will not be liable for a termination, Paragraph 13(d) states that any termination "shall be administered according to FAR Part 49." Appx323. FAR Part 49 governs termination settlements. If the WCRR can pursue relief under FAR Part 49, but it cannot seek this relief against AO, then the only rational interpretation of this paragraph is that WCRR is entitled to pursue a termination claim directly against the Army under the provisions of FAR Part 49.

      3.    The Court Erred in Determining that AO was not Acting as the Army's Agent.

The CFC's decision that AO was not the Army's agent is erroneous. As discussed above, the CFC ignored several statements in the Complaint relating to the agency relationship between AO and the Army. Second, the CFC's opinion misapplies the standard of *United States v. Johnson Controls*, 713 F.2d 1541, 1551 (Fed. Cir. 1983).

This case does falls squarely within the theory "that there can be privity of contract between the government and subcontractors where the prime contractor is a mere government agent." *Johnson Controls*, 713 F.2d at 1551. The Federal Circuit

extrapolated this agency theory based on earlier Supreme Court cases such as *Kern-Limerick, Inc. v. Scurlock*, 347 U.S. 110 (1954) that examined the question of government agency in the state tax context.

As articulated in *Johnson Controls*, this agency theory arises when "the prime contractor was (1) acting as a purchasing agent for the government, (2) the agency relationship between the government and the prime contractor was established by clear contractual consent, and (3) the contract stated that the government would be directly liable to the vendors for the purchase price." 713 F.2d at 1551. All three elements exist in this matter.

*First*, AO procured the TUA for the government. While there is no "purchase" in the traditional sense, AO entered into the TUA to procure services on behalf of the Army. Throughout this entire relationship, JMC still owned MLAAP. AO was merely the property manager who took direction from the Army. The BOA is clear that AO could not enter into a TUA without JMC's approval stating that the Army "***may*** authorize the Contractor to use facilities in support of …tenant use agreements." Appx233.

Additionally, AO did purchase services on behalf of JMC.  The RUF spells out how WCRR will become the "rail provider for MLAAP" and will "assume maintenance of the Government owned locomotives." Appx304. This document goes on to say that WCRR will be taking over AO's past responsibilities of

conducting locomotive PM inspections for the Army. The facility contract and the BOA are both issued under the Armament Retooling and Manufacturing Support ("ARMS") Program. The statute creating this program states that one of its purposes is "to reduce or eliminate the cost of Government ownership of eligible facilities, including the costs of operations and maintenance …" 10 U.S.C. § 7553(b)(6). The statute further states that consideration for the use of these facilities includes "reductions in overhead costs." 10 U.S.C. § 7554(b)(2)(B). In other words, WCRR's role as the rail provider and in performing maintenance on the Government's railcars provided a direct benefit to JMC. Meaning, AO procured this consideration for the Army from WCCR. *See also* Appx234 at ¶ 3.1.2 (defining consideration as "Non-monetary consideration includes **work-in-kind performed by Facility Contractor or tenants** at the Army GOCO plants in exchange for the use of Government property under the ARMS Program.") (emphasis added).

*Second*, the BOA establishes that AO was clearly consenting to be JMC's agent. There are 17 references in the BOA to the "GOCO Contracting Officer" providing authorization and direction to AO. There are several other sections of the BOA requiring AO to receive JMC authorization before taking actions, such as the need to get approval to enter into the TUA. Further, the ARMS Statute defines entities such as AO as "property managers" performing under a "property management contract." This is the very definition of being the property owner's

17

agent. *See* Restatement 3d of Agency, § 1.01 (defining "agency"). These and other provisions in the BOA where AO agreed to continue to seek authorization and direction from the Army show its "clear consent" to act as the Army's agent.

*Third*, the BOA plainly states that the Army will be liable for termination costs. There is no "purchase price" in the TUA as WCRR was paying AO to use the facilities and providing consideration to the Army through services. However, the Army did guarantee that it would pay termination settlement costs associated for any terminated TUA. Appx234. The Army's pledge is echoed in the TUA through the incorporation of FAR Part 49.

Ultimately the issue before the Court is the Government's Motion to Dismiss. At this stage, the Court must take all allegations in the Complaint and referenced documents as true – something the CFC failed to do. Under that standard, Plaintiff has sufficiently pleaded facts that establish that AO was acting as JMC's Agent.

4.  The Test in *Johnson Controls* Should be Expanded.

The *Johnson Controls* case was decided in 1983 – over forty years ago. The scope of Federal contracting has changed dramatically since that time. One of the more significant changes is the expansive use of the Government-Owned Contractor-Operated ("GOCO") facilities. Indeed, the ARMS statute that authorized this particular use of MLAAP was enacted in 2000. Currently, JMC is has six (6)

GOCO run facilities.[2] The Department of Energy has seventeen (17) national laboratories, sixteen (16) of them are run by private companies as GOCO. In total twelve (12) federal agencies sponsor forty-two (42) federally funded research and development centers. Congressional Research Service Report, August 27, 2021 "Federally Funded Research and Development Centers (FFRDCs): Background and Issues for Congress" at 2.

There is no debate that the Federal Government relies extensively on relationships such as the one from JMC to AO to WCRR in this matter. The Government utilizes middlemen agents to procure services such as the rail switch and maintenance performed by WCRR for JMC. The first factor of the three-part test articulated in *Johnson Controls* should be read to include agency relationships such as the one at issue in this matter.

The CFC's narrow interpretation of *Johnson Controls* is denying WCRR any avenue of relief. WCRR invested millions into developing a railway facility that the Army said it could use for 25 years. The Army made this representation knowing full well that this was most likely an empty promise. Then Army exercised its sovereign right to terminate the TUA 23 years early. Now the Army, who controlled this entire process and instructed every action taken by AO, seeks to hide behind its

---

[2] https://www.jmc.army.mil/Business.aspx?id=ARMSSites (last checked August 15, 2024)

agent.  The Court should read *Johnson Controls* more expansively to cover this exact type of agency relationship.[3]

5. <u>The CFC Erred in determining that the Certified Claim Letter was not Submitted.</u>

Even though the CFC addressed the merits of WCRR's Claim, it held that WCRR did not submit the Certified Claim to the Army.  This determination is flawed based on the language of the CDA itself and on Supreme Court guidance that this type of statutory element is jurisdictional.

*First,* the plain language of the CDA states that each claim "shall be ***submitted*** to the contracting officer." 41 U.S.C. § 7103(a)(1) (emphasis added). There is no dispute that the Claim Letter was submitted on three separate occasions. The Army states that the letter was not *received*, but this is an error by the Army and its management of its email servers.  When the Certified Claim Letter was submitted to Mr. DeAnda via email, the Army's email server sent a successful delivery receipt which stated that the server would all send a notice of a failed delivery. Appx374, Appx376. Such notice was never sent.  *Id.* This situation is analogous to a claim being submitted via Federal Express, accepted by the mail system but not delivered to the contracting office. There would be no dispute in this latter context that the

---

[3] WCRR believes that this interpretation of *Johnson Controls* is squarely within the purview of the panel, if however, the panel believes that this would be overruling precedent, WCRR requests that the Court consider this issue *en banc* under Fed. Cir. R. 35(a)(1) given the factors discussed above.  *See* Fed. Cir. R. 35(a)(1)

claim was submitted; nor should there be in this context. The modern world – even the Federal Government – runs via electronic mail. JMC sent communications via email, as did AO. The Army's documents all had the contracting officer's email address.

It does not appear that this Court has addressed the issue of email submission in any context. The CFC has addressed is several times in the context of an electronic proposal submission. One of the seminal CFC cases on this issue is *Insight Sys. Corp. v. United States*, 110 Fed. Cl. 564 (2013). In that case, the CFC determined that "the Government Control exception applies where the electronic proposal is received by a government server (or comparable computer) and is under the agency's control prior to the deadline." *Id.* at 581. *See also Fed. Acquisition Servs. Team, LLC v. United States*, 124 Fed. Cl. 690, 705 (2016) (finding that there was "acceptable evidence to establish that" the proposal was timely received when sent via email and received by the government server). There is no dispute that the Army server received the Certified Claim Letter. Appx376.

There is also no dispute that the Army has received and been aware of the Certified Claim Letter since the onset of this litigation. In addition to including the Claim with the Complaint, the entire Certified Claim Letter package was delivered to the Army Contracting Command on February 20, 2024. Appx374, Appx377. The Army has made its position on the Claim clear throughout this process. As such, the

guidance from the Armed Services Board of Contract Appeals ("ASBCA") on this topic is illuminating. For claim appeals that may not have been brought under the standard CDA timeline, the ASBCA has "held that if, by the time a motion to dismiss is considered, an unreasonable time has elapsed without a decision, no useful purpose would be served by dismissing the appeal and requiring a refiling.*" Appeals of - N. Wind Constr. Servs., LLC*, ASBCA No. 63641, 2024 WL 1700078 (Apr. 3, 2024) (citing *Fru-Con, Constr. Corp.*, ASBCA No. 53544, 02-1 BCA ¶ 31,729 at 156,757). Here, at an absolute minimum, the Army received the Claim Letter eleven months ago. As such, the Claim should be deemed received and denied.

*Second,* Supreme Court decisions on similar statutes have raised questions on the jurisdictional impact of the CDA components. For example in *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998) the Supreme Court in interpreting a 42 U.S.C. § 11046 stated that it "is unreasonable to read [the statute] as making all the elements of the cause of action under subsection (a) jurisdictional, rather than as merely specifying the remedial *powers* of the court, viz., to enforce the violated requirement and to impose civil penalties." The Court went on to state that "'Jurisdiction' … is a word of many, too many, meanings." *Id.* (internal citations omitted).

In *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012) the Court made a similar ruling in the context of *habeus corpus* and held that a "rule is jurisdictional if the

Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional." Further stating that without a clear statement by Congress that a provision is jurisdictional, "courts should treat the restriction as nonjurisdictional." *Id.* Nothing in 41 U.S.C § 7104 provides a jurisdictional restriction. As such, this Court should treat the components of the CDA as non-jurisdictional and treat them as the Supreme Court viewed 42 U.S.C. § 11046 – merely specifying a claimant's path to relief.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

WHEREFORE, WCRR prays that this Honorable Court REVERSE the CFC's grant of a motion to dismiss in favor of the Government; and REMAND this case for further proceedings on WCRR's Claim Appeal.

Respectfully submitted,

*/s/ Thomas K. David*
THOMAS K. DAVID
LEWIS P. RHODES
RESTON LAW GROUP LLP
2100 Reston Parkway
Suite 450
Reston, Virginia 20191
(703) 483-2810

*Attorneys for Plaintiff-Appellant*
*Wolf Creek Railroad LLC*

# ADDENDUM

**TABLE OF CONTENTS TO ADDENDUM**

| Doc. # | Date | Description | Appx Page |
|--------|------|-------------|-----------|
| 19 | 03/26/24 | Opinion and Order | Appx1 |
| 20 | 03/26/24 | Judgment | Appx11 |

# In the United States Court of Federal Claims

WOLF CREEK RAILROAD, LLC,

               *Plaintiff,*

v.

THE UNITED STATES,

               *Defendant.*

No. 23-1684
(Filed: March 26, 2024)

*Lewis Philip Rhodes*, Reston Law Group LLP, Reston, VA, for Plaintiff.

*Sean Kelly Griffin*, Civil Division, United States Department of Justice, Washington, DC, for Defendant.

## OPINION AND ORDER

**LERNER,** *Judge.*

    This matter comes before the Court on the Government's Motion to Dismiss for lack of subject-matter jurisdiction and failure to state a claim.  Mot. to Dismiss, ECF No. 8.  For the reasons below, the Court **GRANTS** the Motion to Dismiss.

## I.    Background

    The United States Army Joint Munitions Command ("Army" or "JMC") owns the Milan Army Ammunition Plant ("MLAAP"), a government facility near Milan, Tennessee.  Compl. at 1–2, ECF No. 1.  In 2008, the Army awarded American Ordnance, LLC ("AO") Contract No. W52P1J-09-E-0001 ("Facility Contract" or "Prime Contract"), which required AO to provide operations and maintenance services for MLAAP.  *Id.* at 2; Mot. to Dismiss, Attach. A, ECF No. 8-1.  The Army also issued Basic Ordering Agreement No. W52P1J-09-G-0001 ("BOA") to AO, which allowed it to acquire operation and maintenance services beyond the specified tasks in the Facility Contract.  Mot. to Dismiss, Attach. B at 4, ECF No. 8-2.  The BOA included a statement of work for the Armament Retooling and Manufacturing Support ("ARMS") initiative.  *Id.* at 15.  The Government could authorize AO to use government facilities in support of third-party agreements under the Facility Contract.  Mot. to Dismiss at 7.  The BOA also expressly stated that the Government was not a party to tenant use agreements ("TUA") entered by AO under the Facility Contract.  Mot. to Dismiss, Attach. B, at 17, ECF No. 8-2.

    In 2018, AO requested authorization from the Army to contract with Plaintiff Wolf Creek Railroad, LLC ("WCRR") to operate a rail system at MLAAP.  Mot. to Dismiss, Attach. C, ECF

No. 8-3; Attach. E, ECF No. 8-5 ("WCRR's TUA").  The Army approved this request but required the contract to be construed as a TUA.  Mot. to Dismiss, Attach. D, at 1, ECF No. 8-4.  The Government reserved the right to cancel the approved use if MLAAP was closed, sold, or transferred outside the Department of the Army.  *Id.* at 3.  Any cancellation would be at no cost to the Government.  *Id.*  Additionally, the Government required the TUA to stipulate that it could not be held liable if WCRR ceased operations because of changes in MLAAP's status.  *Id.*  On June 5, 2018, AO entered a twenty-five-year TUA with WCRR (TUA No. AO 18-0002) with an optional twenty-five-year extension.  WCRR's TUA.

Two years later, in 2019, the Army notified AO that it was ending the "current mission needs for the entirety of MLAAP."  Compl. Ex. 4, ECF No. 1-4.  This notice instructed AO to "cease all [Armament Retooling and Manufacturing Support] efforts" and listed Patrick Lootens as the point of contact for further inquiries.  Compl. Ex. 4.  AO then directed WCRR to cease soliciting new leases at MLAAP.  Compl. at 4.  On April 26, 2021, the Army rescinded authorization for MLAAP facilities under all the TUAs.  *Id.*; Compl. Ex. 5, ECF No. 1-5 (substituting David Deanda as the primary point of contact).  As a result, AO terminated its TUA with WCRR.  Compl. at 4.

WCRR alleges that it submitted a claim letter via email to the Army Contracting Officer ("CO") on May 30, 2023, seeking damages from the TUA's termination.  *Id.* at 5; Pl.'s Resp. to Mot. to Dismiss ("Pl.'s Resp.") at 5, ECF No. 11.  In the same email, WCRR attached a document titled "Claim Certification."  Pl.'s Resp., Ex. 1, Attach. A, at 3, ECF No. 11-1.  The Army did not respond to the email.  Compl. at 5.  WCRR claims that it followed up with the Army on August 1, 2023, and September 5, 2023, and both times the Army did not respond.  *Id.*

On September 29, 2023, WCRR filed the instant Complaint alleging both breach of contract and the covenant of good faith and fair dealing.  Compl. at 5–6.  In response, the Government moved to dismiss the Complaint for lack of subject-matter jurisdiction and failure to state a claim.  Mot. to Dismiss.  The Government argues that the Court must dismiss this action for two independent reasons: 1) WCRR failed to properly submit a certified claim, and 2) WCRR cannot establish privity of contract with the Government.  *Id.* at 9.

## II.     Legal Standards

### A.     Jurisdiction

The Tucker Act grants this Court "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under" the Contract Disputes Act ("CDA").  28 U.S.C. § 1491(a)(2); *see also* 41 U.S.C. § 7102(a) (CDA applies to "any express or implied contract . . . made by an executive agency").  "If a plaintiff meets the jurisdictional requirements of the Tucker Act, the plaintiff also must demonstrate compliance with the mandatory requirements of the [CDA]."  *Crewzers Fire Crew Transp., Inc. v. United States*, 111 Fed. Cl. 148, 153 (2013), *aff'd*, 741 F.3d 1380 (Fed. Cir. 2014).  For this Court to exercise jurisdiction over a CDA claim, a contractor must bring an action "within 12 months from the date of receipt of a contracting officer's decision."  41 U.S.C. § 7104(b)(3).  Further, jurisdiction "requires both a valid claim and a contracting officer's final decision on that claim."  *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010).  If a claim seeks more than $100,000, it must also meet the CDA's certification requirements.  41 U.S.C. § 7103(b)(1).

**B.      Motion to Dismiss Under Rule 12(b)(1) and 12(b)(6)**

The Government moves to dismiss the Complaint under Rule 12(b)(1) for lack of subject-matter jurisdiction and 12(b)(6) for failure to state a claim.  Rules of the Court of Federal Claims ("RCFC") 12(b)(1), (b)(6).  "In determining jurisdiction, a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff."  *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011).  Plaintiff bears the burden of establishing jurisdiction by a preponderance of evidence.  *Id.*  "If jurisdictional facts are challenged, the court is not limited to the pleadings in determining whether it possesses subject-matter jurisdiction to entertain the plaintiff's claims."  *Groundbreaker Dev. Corp. v. United States*, 163 Fed. Cl. 619, 623 (2023) (citing *Banks v. United States*, 741 F.3d 1268, 1277 (Fed. Cir. 2014)).  If the Court lacks jurisdiction over a claim, RCFC 12(h)(3) requires dismissal.

In evaluating a Rule 12(b)(6) motion, "the court must accept all well-pled factual allegations as true and draw all reasonable inferences in the plaintiff[']s favor."  *Ainslie v. United States*, 355 F.3d 1371, 1373 (Fed. Cir. 2004).  Plaintiff "must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief" to state a valid claim and survive a 12(b)(6) motion.  *Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009) (citing *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007)) (finding that these facts must "raise a right to relief above the speculative level"); *Leider v. United States*, 301 F.3d 1290, 1295 (Fed. Cir. 2002) (holding that dismissal under 12(b)(6) is proper when a plaintiff "can prove no set of facts in support of [its] claim which would entitle [it] to relief").  Thus, the key inquiry here is whether Plaintiff has pled sufficient facts to draw a reasonable inference that the Government is liable.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Whether Plaintiff is in privity with the Government is a threshold inquiry impacting both subject-matter jurisdiction (i.e., whether the waiver of sovereign immunity under the Tucker Act applies) and the merits of WCRR's claims (i.e., whether the Government is liable for termination and breach of the TUA).  *See First Annapolis Bancorp, Inc. v. United States*, 644 F.3d 1367, 1373 (Fed. Cir. 2011) (discussing how lack of privity impacts subject-matter jurisdiction); *Riviera Drilling & Expl. Co. v. United States*, 61 Fed. Cl. 395, 400 (2004) (collecting authority supporting opposing views that privity of contract is jurisdictional or goes to the merits).  In any case, if the jurisdictional issue and the merits are "inextricably intertwined, and the former cannot be resolved without considering and deciding (at least in part) the latter[,]" the Court may "bypass[] the jurisdictional question and decide[] the merits."  *Nippon Steel Corp. v. United States*, 219 F.3d 1348, 1353 (Fed. Cir. 2000); *see also Ransom v. United States*, 17 Cl. Ct. 263, 267 (1989).

**III.      Discussion**

**A.      WCRR Did Not Submit a Certified Claim.**

The Federal Circuit defines a valid CDA "claim" as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract."  *Zafer Constr. Co. v. United States*, 40 F.4th 1365, 1367 (Fed. Cir. 2022) (quoting 48 C.F.R. § 52.233-1(c)).  If the contractor seeks more than $100,000, as is the

3

case here, the contractor must certify the claim. 41 U.S.C. § 7103(b)(1) (certification requirement generally), (b)(3) (definition of "defective certification"). No magic words are required, but the contractor must unequivocally seek the CO's final decision addressing the contractor's claim for its alleged losses. *Zafer*, 40 F.4th at 1369 (finding persuasive "a sworn statement attesting to the truth of the submission, includ[ing] detailed factual bases for its alleged losses, and . . . a sum certain based on the losses").

Because the Government challenges Plaintiff's jurisdictional assertion that a CDA claim was properly submitted and certified,[1] the Court may consider relevant evidence outside the pleadings to resolve that factual dispute. *Banks*, 741 F.3d at 1277. WCRR must show by a preponderance of the evidence that it submitted its claim to the contracting officer. *See M. Maropakis Carpentry, Inc.*, 609 F.3d at 1327, 1329 (finding "strict limits of the CDA as jurisdictional prerequisites to any appeal") (citations omitted); 41 U.S.C. § 7103(a)(1). A contractor can meet this submission requirement by sending its claim directly to the CO or to their "primary contact with a request for a final decision of the contracting officer and a reasonable expectation that such a request will be honored, and the primary contact in fact timely delivers the claim to the contracting officer." *Neal & Co. v. United States*, 945 F.2d 385, 388 (Fed. Cir. 1991) (emphasis omitted).

Here, Plaintiff relies on a purported copy of the May 30, 2023 Claim Letter, its counsel's affidavits declaring that he emailed the Claim Letter to Mr. Patrick Lootens and Mr. David Deanda, and screenshots of the emails. Compl., Ex. 2; Pl.'s Resp., Ex. 1 at 1; Pl.'s Sur-reply in Opp. to Mot. to Dismiss ("Pl.'s Sur-reply"), Ex. 1, ECF No. 18-1. In both its Complaint and Response to the Motion to Dismiss, WCRR identifies Mr. Lootens as the Army CO. Compl. at 5; Pl.'s Resp., Ex. 1 at 1. Plaintiff also alleges that it "reached out" to Mr. Deanda on September 5, 2023, another Army CO, and "confirmed through email delivery receipts" that both individuals received the Claim Letter. Compl. at 5; Pl.'s Sur-reply, Ex. 1, at 1-2. Specifically, Plaintiff asserts that it forwarded the claim to Mr. Deanda at his email address provided on the rescission letter (david.d.deanda2.civ@mail.mil). Pl.'s Sur-reply, Ex. 1, at 4; Compl., Ex. 5, at 1.

In contrast, the Government submitted two affidavits, one from Mr. Deanda and another from Mr. Beau Bixler, the CO for the Facility Contract from March 2022 to present. Def.'s Reply, Ex. 1 ("Bixler Decl."), ECF No. 15-1; Def.'s Reply, Ex. 2 ("Deanda Decl."), ECF No. 15-2. These affidavits assert that 1) Mr. Lootens, the former CO for the Facility Contract, retired on August 3, 2020, and was not an Army CO in May 2023; 2) Mr. Deanda was only a CO for this contract from December 2020 to March 2022, and never received correspondence from WCRR regarding the TUA; and 3) Mr. Bixler also never received any emails from Plaintiff or its counsel about the TUA. Bixler Decl.; Deanda Decl. Mr. Deanda also averred that the agency migrated his previous email account (david.d.deanda.2.civ@mail.mil) to a new account on November 23,

---

[1]     WCRR's purported email to Mr. Lootens included the Claim Letter and FAR 33.207(c)'s certification language as two separate attachments. Pl.'s Resp., Ex. 1 at 3-5. If WCRR had timely emailed two documents, while technically deficient, it would be a curable error. FAR 33.201 (defining defective certification); *see Midatlantic Constr. & Design Assocs., Inc. v. United States*, No. 22-447C, 2023 WL 3269668, *4 (Fed. Cl. May 5, 2023) (holding that a defective certification does not deprive the Court of jurisdiction). Accordingly, any debate over certification of Plaintiff's claim is moot.

2021, at which time his previous account was deleted and not archived. Deanda Decl. Both Mr. Deanda and Mr. Bixler stated that these declarations were prepared after thoroughly searching their records. Deanda Decl.; Bixler Decl.

Even if the Court took all of Plaintiff's assertions as true, "[t]he contractor bears the risk for delayed or lost submissions prior to receipt by the CO." *Am. Pac. Roofing Co. v. United States*, 21 Cl. Ct. 265, 268 (1990); *see also Dawco Constr., Inc. v. United States*, 930 F.2d 872, 880 (Fed. Cir. 1991), *overruled on other grounds by Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995). WCRR contends that receipt by the Government's email server constitutes a proper submission and cites *Insight Sys. Corp. v. United States* for support. 110 Fed. Cl. 564, 581 (2013) ("[T]he Government Control exception applies where the electronic proposal is received by a government server (or comparable computer) and is under the agency's control prior to the deadline."). But this case is unpersuasive, as it addresses an exception under FAR 52.212-1(f)(2)(i) in the context of bid protests. *Id.* There is no analogous carve out for contractors under 41 U.S.C. § 7104. And even though the *Insight* court allowed an exception under the FAR, it cautioned against construing such exceptions too broadly. 110 Fed. Cl. at 575 ("Courts construing these exceptions admittedly must walk a fine line."). Thus, the risk falls on WCRR even if it emailed the claim to Mr. Deanda and the message was redirected or lost. *See Diversified Maint. Sys., Inc. v. United States*, 110 Fed. Cl. 612, 617 (2013) (holding that even if the court found that plaintiff mailed its claim but it was not received, plaintiff still bears the risk).

Under these circumstances, Plaintiff has presented insufficient evidence[2] that would allow the Court to conclude that the Claim Letter was actually submitted to or received by the Army CO for a final decision. WCRR fails to meet its jurisdictional burden. *See, e.g.*, *id.* at 616 (comparing plaintiff's lack of evidence on its purported claim submission with defendant's affidavit asserting that "despite a thorough search," the claim letter was not found in a retired CO's files); *Emiabata v. United States*, 135 Fed. Cl. 213, 219 (2017) (concluding that plaintiff did not establish jurisdiction because he "fail[ed] to present a single document in support of his allegations"); *Capelouto v. United States*, 99 Fed. Cl. 682, 693 (2011) (dismissing suit for lack of jurisdiction because plaintiff "failed to prove that he submitted a CDA claim to any contracting officer responsible for his alleged contracts"); *L.A. Ruiz Assocs., Inc. v. United States*, 94 Fed. Cl. 768, 772 (2010) (holding that the court lacked jurisdiction because plaintiff did not present evidence that could allow the court to conclude that the letter was "actually submitted to, or received by, the contracting officer for review").

**B.   WCRR Is not in Privity with the Government.**

This dispute involves three contracts; WCRR is a party only to the TUA. None of these agreements establish privity of contract between WCRR and the Army.

---

[2]     It appears that Plaintiff submitted the claim letter to the wrong email address. *Compare* Pl.'s Sur-reply, Ex. 1 (email addressed to david.d.deanda2.civ@mail.mil) *with* Deanda Decl. (showing that Mr. Deanda's email username, before and after the mailbox migration, was david.d.deanda.2.civ). While the email Plaintiff used was listed on the rescission letter, the contractor bears the risk.

To begin, this Court must strictly construe waivers of sovereign immunity. *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1557 (Fed. Cir. 1983); *Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1263 (Fed. Cir. 2005) ("[T]he government does not lightly consent to suit."). The CDA provides a waiver of sovereign immunity for *contractors* because by entering directly into a contract with a party, the Government expresses an intent to open itself to a suit by that party under the Tucker Act. 28 U.S.C. § 1491(a)(1) (allowing suits based "upon [an] express or implied contract with the United States"). "When the government chooses instead to employ a two-tier contracting scheme whereby it has no direct contractual relationship with an entity, the intent . . . is not similarly apparent." *Nat'l Leased Hous. Ass'n v. United States*, 32 Fed. Cl. 454, 459 (1994). Accordingly, "[f]inding subcontractors in contractual privity . . . would represent a dramatic extension of this waiver." *Lockheed Martin Corp. v. United States*, 50 Fed. Cl. 550, 562 (2001), *aff'd*, 48 F. App'x 752 (Fed. Cir. 2002).

WCRR claims that it is in privity with the Government because AO acted as the Government's agent. Pl.'s Resp. at 13. The Federal Circuit established three prerequisites for the Government to be directly liable to a subcontractor on an agency theory. *Johnson Controls, Inc.*, 713 F.2d at 1551. To establish privity, the subcontractor must satisfy three factors: "(1) [the prime contractor] act[ed] as a purchasing agent for the government, (2) the agency relationship between the government and the prime contractor was established by clear contractual consent, and (3) the contract stated that the government would be directly liable to the vendors for the purchase price." *Id.* (citing *Kern–Limerick, Inc. v. Scurlock*, 347 U.S. 110, 112 n.2 (1954)) (emphasis omitted). Given these stringent prerequisites and the Court's review of the relevant contracts, WCRR has failed to sufficiently allege facts supporting an agency relationship between AO and the Government.

### 1.   AO Did not Act as the Government's Purchasing Agent.

WCRR contends that AO was a purchasing agent because it procured services for the Army. Pl.'s Resp. at 14. In support, WCRR notes that the Facility Contract and BOA were both issued under the ARMS initiative, which aims "[t]o reduce or eliminate the cost of Government ownership of eligible facilities, including the costs of operations and maintenance" via contracts with private parties such as AO. Pl's Resp. at 14 (citing 10 U.S.C. § 7553(b)(6)). WCRR overstates AO's role, which is closer to an operator of the MLAAP facility. The implementation of the Facility Contract and BOA under the ARMS initiative does not show that AO bought WCRR's rail services for the Army. Rather, WCRR paid AO to use the facilities. WCRR's TUA at 5; Pl.'s Resp. at 15. In fact, the Army bought nothing from WCRR. At most, the Army is a third-party beneficiary of a contract between two private parties—an attenuated relationship to WCRR that cannot support privity. *See Wagner v. United States*, 71 Fed. Cl. 355, 364 (2006) (citing *Fireman's Fund Ins. Co. v. United States*, 909 F.2d 495, 499-500 (Fed. Cir. 1990)).

Moreover, the BOA's requirement that the Army authorize the TUAs and other third-party contracts does not show that AO was a purchasing agent. To establish an agency relationship, the Army must have "meaningful control" over AO, such as a right of control over the methods by which it accomplishes its task. *Pac. Gas & Elec. Co. v. United States*, 838 F.3d 1341, 1359–60 (Fed. Cir. 2016) (citing Restatement (Third) of Agency § 1.01 cmt. e.).

The requisite control is absent here. Instead, the TUA reflects AO's supervisory role over WCRR, rather than the Army's control over AO. For example, WCRR needs express,

written approval from AO to remove any government property from the facilities.  WCRR's TUA at 4.  AO and WCRR must also agree on how to conduct an environmental baseline survey and remedy environmental violations.  *Id.*  Similarly, AO and WCRR negotiate the length and conditions of any renewal, even if a renewed contract would be subject to the Government's approval.  *Id.*  And WCRR sends statements that itemize all its revenue to AO, along with documentation to support the number of railcars stored and moved.  *Id.* at 5.  Thus, the TUA shows AO's control over its own management of its lessees without agency interference.  Indeed, "the need for [a prime contractor] to obtain [agency] approval does not create an agency relationship."  *Ground Improvement Techniques, Inc.*, 618 F. App'x 1020, 1031 (Fed. Cir. 2015).

In fact, where courts have found that a contractor was a purchasing agent, the prime contract included an *express* term identifying the contractor as such.  *See, e.g.*, *Kern–Limerick, Inc.*, 347 U.S. at 112 n.2  (construction contract provided that "'[t]he Contractor shall act as the purchasing agent of the Government in effecting such procurement.'"); *W. Union Tel. Co. v. United States*, 66 Ct. Cl. 38, 39 (1928) (contract provided that construction manager was "'empowered and authorized to make, as agent for the United States of America, all contracts . . . .'").  *Cf. U.S. W. Commc'ns Servs., Inc. v. United States*, 940 F.2d 622, 629–30 (Fed. Cir. 1991) (finding that a contractor was not an "agent or conduit" for an agency because the contact did not expressly allow the contractor to act as the procurement agent).  No such term exists here.

At most, the ARMS statute defines entities such as AO as "property managers" performing under a "property management contract."  Pl.'s Resp. at 15; *see* 10 U.S.C. § 7553.  There is no explicit language identifying AO as an agent.  Also, while WCRR falsely equates "property managers" to government agents, Pl.'s Resp. at 15, this argument suggests that the Government intended to create an agency relationship with every private entity it contracts with under the ARMS statute—an untenable conclusion.

## 2.  AO and the Army Did Not Consent to an Agency Relationship.

Plaintiff's allegations do not establish that AO and the Government consented to an agency relationship.  The principal and agent must both manifest their assent to create an agency relationship, and this intent must be expressed in either words or conduct.  *Pac. Gas & Elec. Co.*, 838 F.3d at 1359 (citing 12 *Williston on Contracts* § 35:1 (4th ed. 2016)).  Again, the contracts do not contain an express term identifying AO as the Army's agent.  WCRR instead relies on the BOA's seventeen references to the CO providing direction and authorization to AO.  Pl.'s Resp. at 15.  But these provisions simply require AO to perform certain specified actions in a manner prescribed by the agency.  "Government agencies make analogous demands in every government contract," and under Federal Circuit authority, such limitations are not enough to establish clear contractual consent.  *Nat'l Leased Hous. Ass'n*, 32 Fed. Cl. at 461 (citing *Johnson Controls, Inc.*, 713 F.2d at 1551).

The BOA shows the Army's intent was exactly the opposite—government approval for use of the MLAAP under the ARMS initiative was not to be construed as an extension of the Facility Contract.  Mot. to Dismiss, Attach. B, at 15 ("The contractor [AO] shall be authorized to use the facilities for commercial, non-Government, third party, or tenant use under the authorization of FAR Part 45 and the ARMS Initiative.  *In no instance shall the approval for use of facilities within the guidelines of this scope be considered an extension of the basic facility*

7

*contract.*") (emphasis added).  Likewise, the TUA specifically states that the Government is *not* a party to the tenant use agreements.  *Id.* at 17 ("3.3.7 The Government is not a party to the Tenant Use Agreements and does not deal directly with the tenants.").

WCRR claims that these provisions have "no impact on whether or not AO was acting as JMC's agent."  Pl.'s Resp. at 15.  Instead, under Plaintiff's theory, the Court should find the requisite "clear contractual consent" in the BOA's seventeen references to government authorization.  *Id.*  WCRR provides no legal authority for this argument.  The Court declines to adopt this interpretation, especially as it contradicts the plain language of the contract and would render "a portion of the contract useless, inexplicable, void, or superfluous.  *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (requiring courts to interpret contracts "so as to harmonize and give reasonable meaning to all of its parts").

### 3. The Relevant Contracts Did not "Plainly State" that the Government Will Be Liable for Termination Costs.

The BOA, a contract between the Army and AO, incorporated FAR Part 49.  According to WCRR, this incorporation—in a contract to which it was not a party—demonstrates that the Army guaranteed that it would pay termination settlement costs for any terminated TUA.  Pl.'s Resp. at 15.  But this does not serve as a plain statement "that the government would be directly liable to [WCRR] for the purchase price"—the third requirement needed to establish an agency relationship between the Government and AO.  *Johnson Controls*, 713 F.2d at 1551.  In fact, WCRR concedes that "[t]here is no 'purchase price' in the TUA."  Pl.'s Resp. at 15.

WCRR does not identify any explicit provision in FAR Part 49 allowing direct subcontractor appeals to the Government after a termination for convenience.  Indeed, direct subcontractor appeals occur in unique circumstances, none of which are present here.  Instead, FAR Part 49 provides processes by which subcontractors can seek payment from the prime contractor, but not the Government.  *See, e.g.*, FAR 49.108-1 ("A subcontractor has no contractual rights against the Government upon the termination of a prime contract.  A subcontractor may have rights against the prime contractor or intermediate subcontractor with whom it has contracted.  Upon termination of a prime contract, the prime contractor and each subcontractor are responsible for the prompt settlement of the settlement proposals of their immediate subcontractors."), 49.108-7 ("In unusual cases the TCO may determine, with the consent of the prime contractor, that it is in the Government's interest to provide assistance to the prime contractor in the settlement of a particular subcontract."), 49.108-8(b) ("[The Government's discretionary right to settle and pay any settlement proposal arising out of termination of subcontractors] *does not obligate* the Government to settle and pay settlement proposals of subcontractors.") (emphasis added).  Accordingly, the Court does not find direct, unavoidable Government liability based on Plaintiff's superficial citation to FAR Part 49.

### 4. WCRR's Request for Jurisdictional Discovery Is Denied.

Alternatively, WCRR requests that the Court allow it to conduct discovery on whether AO and the Army had an agency relationship.  Pl.'s Resp. at 16.  Discovery is unnecessary here, and the Court declines to stay proceedings on the Motion to Dismiss to allow it.  While Plaintiff provides no persuasive legal authority for its request, when a party challenges a jurisdictional fact alleged in a complaint, the court may permit limited discovery to resolve the factual dispute.

Appx8

*See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1978) ("[W]here issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues."). That said, if challenges to the complaint "implicate legal questions for which no fact discovery [i]s required," then a court can deny a party's request for jurisdictional discovery. *Harris v. United States*, 868 F.3d 1376, 1378 (Fed. Cir. 2017).

WCRR seeks to discover "communications between AO and JMC or any knowledge of JMC's directions other than what is apparent from the documents." Pl.'s Resp. at 16. This assertion regarding lack of access to communications departs from the theory of privity Plaintiff asserted in its Complaint and briefs. *See* Compl. at 3; Pl.'s Resp. at 13 (stating that this case "falls squarely" within the theory of privity discussed in *Johnson Controls*). In its jurisdictional arguments, WCRR alleges that the Facility Contract, BOA, and TUA's terms formed the agency relationship between AO and the Army. *See, e.g.*, Compl. at 3 ("At all relevant times, AO was operating as the Army's agent . . . under the Operations & Maintenance Contract [or the Facility Contract] . . . . The agency relationship between the Army and AO was established by clear contractual consent."); Pl.'s Resp. at 11 ("[B]oth the BOA and the TUA incorporate FAR Part 49, which is the FAR section governing a termination by the Government. This part of the FAR provides the basis for . . . the Claim advanced by WCRR."). Now, faced with the Motion to Dismiss, WCRR seems to suggest a second, fact-driven theory of privity—that privity may have been created via the Army's direct control over AO and WCRR's actions under the TUA.

*Johnson Controls*' test focuses on contract provisions for proof of agency relationship, and thus does not apply when a plaintiff alleges that the government's day-to-day control over a contractor established privity. *Johnson Controls, Inc.*, 713 F.2d at 1553 ("It is also significant to note that it has not been asserted . . . that direct dealings between the government and Johnson created privity of contract[.]"). WCRR also offers no authority supporting this second theory of privity, and this court previously rejected similar arguments. *See, e.g.*, *Lockheed Martin Corp.*, 50 Fed. at 559 (finding that plaintiffs' "fact-driven theory of privity is not supported by authority, and that their factual case is, in a word, irrelevant"). Indeed, WCRR does not allege any facts showing that the Army's control over WCRR was significant such that the Government subverted AO's independent authority and "convert[ed] the government contractor into a federal agency." *Demodulation, Inc. v. United States*, 123 Fed. Cl. 98, 104 (2015) (citing *Blue Water Envtl., Inc. v. United States*, 60 Fed. Cl. 48, 51 (2004) and *United States v. Orleans*, 425 U.S. 807, 814 (1976)).

The implications of Plaintiff's theory of privity are far-reaching. If this Court allows for discovery on this issue, then "any subcontractor who had a dispute concerning its subcontract would have the right to obtain discovery exploring the entire course of contract activity between the parties"—simply to establish jurisdiction. *Lockheed Martin Corp.*, 50 Fed. Cl. at 559 (noting that discovery involving access to about 5 million pages of documents "provide[d] a dramatic illustration" of how the privity by conduct theory "simply goes too far").

The central issues—whether the Complaint sufficiently alleges jurisdiction under Rule 12(b)(1) and states a claim under Rule 12(b)(6)—can be resolved without further discovery. *See, e.g.*, *Lea v. United States*, 120 Fed. Cl. 440, 444 (2015) (denying plaintiff's discovery request because the court would still lack jurisdiction to entertain its noncontractual claims, even if they were factually supported). Based on the relevant contracts, WCRR fails to allege contractual privity with the Government, and the Court must dismiss the Complaint. RCFC 12(h)(3).

**IV.    Conclusion**

A middleman is not automatically an agent.  While the Army did provide direction and authorization to AO in discrete situations, it also apparently intended to use AO "as a buffer between it and the claims of the subcontractors." *Johnson Controls, Inc.*, 713 F.2d at 1541. Thus, the agreements here have not created an agency relationship between AO and the Army, and WCRR is not in privity of contract with the Government.

For these reasons, the Court **GRANTS** the Government's Motion to Dismiss and directs the Clerk of the Court to enter judgment accordingly.

**IT IS SO ORDERED.**

 s/ Carolyn N. Lerner
CAROLYN N. LERNER
Judge

# In the United States Court of Federal Claims

**No. 23-1684 C**
**Filed: March 26, 2024**

```
*************************************
WOLF CREEK RAILROAD, LLC,          *
         Plaintiff,                *            JUDGMENT
                                   *
      v.                           *
                                   *
THE UNITED STATES,                 *
         Defendant.                *
*************************************
```

       Pursuant to the court's Opinion and Order, filed March 26, 2024, granting defendant's motion to dismiss,

       IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiff's complaint is dismissed.

                                Lisa L. Reyes,
                                Clerk of Court

                          By: s/ Ashley Reams_____
                                Deputy Clerk

NOTE: As to appeal to the United States Court of Appeals for the Federal Circuit, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs. Effective December 1, 2023, the appeals fee is $605.00.

Appx11

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMITATIONS

**Case Number:** 24-1873

**Short Case Caption:** Wolf Creek Railroad LLC v. United States

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [✔] the filing has been prepared using a proportionally-spaced typeface and includes 5,541 words.

- [ ] the filing has been prepared using a monospaced typeface and includes _____ lines of text.

- [ ] the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 08/16/2024

Signature: /s/ Thomas K. David

Name: Thomas K. David

Save for Filing